**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

**THE UNITED STATES OF AMERICA**
**and THE STATE OF TEXAS**
 **ex. rel. ROBERT SPENCE, MIKE JONES**
**and CHERYL JONES**

       **Plaintiffs,**

**vs.**

**IRVING HOLDINGS, INC d/b/a YELLOW CAB**
**and BUSINESSEXEC SEDAN SERVICE;**
**NORTH TEXAS OPPORTUNITY FUND, L.P.;**
**NTOF CAPITAL PARTNERS, LLC;**
**NORTH TEXAS OPPORTUNITY FUND**
**CAPITAL PARTNERS, LP; 3 NORTH TEXAS**
 **INVESTMENT ADVISORS LLC D/B/A**
 **NTIA - OPPORTUNITY FUND;**
**LONE STAR INVESTMENT ADVISORS,**
**LLC; DALLAS CAR LEASING, LLC;**
**YELLOW CHECKER CAB OF DALLAS,**
**INC.; YELLOW CHECKER CAB OF**
**FORT WORTH, INC.; BIG TEX TAXI**
**CORPORATION; TERMINAL TAXI**
**CORPORATION; TERMINAL TAXI**
**CORPORATION OF IRVING; CHOICE**
**CAB, INC.; CLASSIC SHUTTLE**
**ACQUISITION CORPORATION, INC.**
**D/B/A GO YELLOW CHECKER SHUTTLE;**
**JETTAXI, INC.;  US CAB, LLC; DALLAS**
**TAXI, LLC; JEFF FINKEL; JACK BEWLEY;**
**WILLIAM TAUSCHER; ARTHUR**
**HOLLINGSWORTH; GREG CAMPBELL; and**
**LUKE SWEETSER**

       **Defendants.**

**CIVIL ACTION NO.  ___4:12cv487_____**
**FILED UNDER SEAL PURSUANT**
**TO SECTION 3729 et. seq. of the**
**FEDERAL FALSE CLAIMS ACT and**
**CHAPTER 36.102(b) OF THE TEXAS**
**HUMAN RESOURCES CODE**

---

PLAINTIFFS' ORIGINAL COMPLAINT                                         Page 1

# TABLE OF CONTENTS

**PAGE**

I.  INTRODUCTION .................................................................................................. 4

II. JURISDICTION AND VENUE.......................................................................... 6

III. CONDITIONS PRECEDENT…………………………………………………… 6

IV. PARTIES ........................................................................................................... 7

V.  FACTS…………………………………………………………………………12

    A. OVERVIEW……………………………………………………………………. 12
    B. DRIVERS REPEATEDLY GOT FINED $500 FOR COMMITTING MEDICAID
       FRAUD BUT THE DEFENDANTS KEPT THE MONEY FOR THE
       FRAUDULENT CLAIMS SUBMITTED, AND DIDN'T REPORT THE
       DRIVERS' FRAUD TO THE TEXAS HHSC AS THE DEFENDANTS
       REPRESENTED TO THE STATE OF TEXAS THEY WOULD DO! ………………. 14
    C. RELATOR MIKE JONES, MEDICAID COMPLIANCE OFFICER, GOT
       FIRED BY IRVING HOLDINGS FOR DETECTING TOO MUCH FRAUD??........... 18
    D. THE FRAUDULENT MISREPRESENTATIONS MADE BY THE
       DEFENDANTS TO INDUCE THE STATE OF TEXAS TO AWARD
       MTP CONTRACTS TO THE DEFENDANTS……………………………………… 20
    E.  WE DON'T DO CRIMINAL BACKGROUND CHECKS ON OUR
       DRIVERS --UNLESS THEY SUE US! ........................................................ 22
    F. CATCH US IF YOU CAN! YOU CAN CHANGE THE REGULATIONS ALL
       YOU WANT BUT WE ARE GOING TO IGNORE OR CIRCUMVENT THEM-
       - ALL WE HAVE TO DO IS FORM ANOTHER CORPORATION!! ……………. 24
    G.  THE "TWO-CHECK" SYSTEM-- ONE THE DRIVER GOT AND
       THE OTHER WAS STAMPED "FOR DEPOSIT ONLY" AND
       DEPOSITED INTO THE ACCOUNT OF --NOT THE DRIVER IT IS MADE
       PAYABLE TO-- BUT TO THE ACCOUNT OF YELLOW CAB?? ……………... 29
    H. THE MEDICAID AUDITORS ARE COMING, BUT SILLY THEM--
       THEY GAVE US THE CLAIMS THEY WANT TO INVESTIGATE IN
       ADVANCE,  SO  LET'S ALTER THE PAPERWORK, WHITE OUT
       SIGNATURES,  DO WHATEVER IT TAKES TO MAKE THEM GO AWAY.
       LET'S EVEN PUT ON A "FAKE  DRIVER'S TRAINING COURSE" FOR THEM
       FOR GOOD MEASURE!!.........................................................................30
    I. WHAT DID NTOF KNOW, WHEN DID IT KNOW IT, AND
       WHAT DID IT DO ABOUT IT?…………………………………………………31
    J. WE BILL FOR TRANSPORTING DEAD PEOPLE!! ……………………………..  33
    K. THE NORTH TEXAS OPPORTUNITY FUND HAS HAD OTHER COMPANIES
       IT INVESTED IN AND CONTROLS VIOLATE OTHER FEDERAL LAWS …… 34

VI. CAUSES OF ACTION

A. COUNT ONE-- SUNSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT [31 U.S.C. §§ 3729(a)(A), (B),(D) and  (G)]……………………..……35

B. COUNT TWO-- SUBSTANTIVE VIOLATIONS OF THE TEXAS FALSE CLAIMS ACT [Texas Human Resources Code §§ 36.002 (1), (2),    (3)    &    (12)]………………………………………………………...........39

C.  COUNT THREE--FEDERAL FALSE CLAIMS ACT CONSPIRACY [31 U.S.C. §§ 3729(C)] ………………………………………………………...45

D. COUNT FOUR--TEXAS MEDICAID FRAUD PREVENTION ACT CONSPIRACY  [Tex. Human Resources Code §36.002(9)]……………………………………………………………………… 46

E.  COUNT FIVE --BREACH OF CONTRACT  …………………………………… 48

F.  COUNT SIX --NEGLIGENCE  …………………………………………………  48

G. COUNT SEVE--DEMAND FOR ACCOUNTING AND AUDIT………………  49

H. COUNT EIGHT--UNJUST ENRICHMENT ………………………………………  49

PRAYER.......................................................................................................................  50

JURY DEMAND.........................................................................................................52

## <u>PLAINTIFFS' ORIGINAL COMPLAINT</u>

COME NOW ROBERT SPENCE, MIKE JONES and CHERYL JONES, on behalf of the United States of America and the State of Texas, by and through their attorneys, James "Rusty" Tucker of the Law Offices of James R. Tucker, P.C., and respectfully would show unto the Court the following:

### I.  INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America and the State of Texas arising from false statements and claims made, presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended ("THE FEDERAL FALSE CLAIMS ACT "), and the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§ 36.001 *et seq*. ("TEXAS FALSE CLAIMS ACT").

2. THE FEDERAL FALSE CLAIMS ACT provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval of payment is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the government. The TEXAS FALSE CLAIMS ACT similarly provides for civil penalties of up to $10,000 for each false claim and civil remedies of three times the amount paid as a result of the false claims. Liability attaches (i) when a defendant knowingly seeks payment that is unwarranted from the government and/or (ii) when false records or statements are knowingly created or used to conceal, avoid or decrease an obligation to pay or transmit money to the government. THE FEDERAL FALSE CLAIMS ACT and TEXAS FALSE CLAIMS ACT each allow any person having information regarding a false or fraudulent claim against the government to bring an action for himself or herself (the "Relator" or "*qui tam* plaintiff") and on behalf of  the government and to share in any recovery. The Complaint is filed under seal for at least 60 days (without service on the Defendants during that period) to enable the government: (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join in the action.

3. In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program ("Medicare"), to pay for the costs of certain health care services for those persons entitled to receive such health care. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. The United States Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program. The Center for Medicare Services ("CMS") is an agency of HHS and is directly responsible for the administration of the Medicare Program.

4. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily children under the age of 18 and the poor and disabled. The federal government's involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

5. Plaintiffs ROBERT SPENCE, MIKE JONES and CHERYL JONES (the "Relators") bring this action on behalf of the United States of America and the State of Texas against Defendants IRVING HOLDINGS, INC d/b/a YELLOW CAB and BUSINESSEXEC SEDAN SERVICE; NORTH TEXAS OPPORTUNITY FUND, L.P.; NORTH TEXAS OPPORTUNITY FUND CAPITAL PARTNERS LP; NTOF CAPITAL PARTNERS, LLC; 3 NORTH TEXAS INVESTMENT ADVISORS LLC D/B/A NTIA - OPPORTUNITY FUND, LLC; LONE STAR INVESTMENT ADVISORS, LLC; DALLAS CAR LEASING, LLC; YELLOW CHECKER CAB OF DALLAS, INC.; YELLOW CHECKER CAB OF FORT WORTH, INC.; BIG TEX TAXI CORPORATION; TERMINAL TAXI CORPORATION; TERMINAL TAXI CORPORATION OF IRVING; CHOICE CAB, INC.; CLASSIC SHUTTLE ACQUISITION CORPORATION, INC. D/B/A GO YELLOW CHECKER SHUTTLE; JETTAXI, INC.; US CAB, LLC; DALLAS TAXI, LLC; JEFF FINKEL; JACK BEWLEY; WILLIAM TAUSCHER; ARTHUR HOLLINGSWORTH; GREG CAMPBELL; and LUKE SWEETSER (hereinafter sometimes referred to as "Yellow Cab Defendants") for civil damages and penalties arising from the Defendants' false claims in violation of THE FEDERAL FALSE CLAIMS ACT and the TEXAS FALSE CLAIMS ACT. The violations at issue arise out of false Medicaid and Medicare claims by the Defendants who fraudulently billed the government for Medicare and Medicaid payments for a twelve (12) year period for providing medical transportation services for

Medicare and Medicaid patients that were not in conformity with federal and/or state statutes and/or regulations authorizing reimbursement for said charges.


## II. JURISDICTION AND VENUE

6. This Court has Jurisdiction of this action because it arises under THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et. seq., as well as Chapter 36 et. seq. of the TEXAS FALSE CLAIMS ACT.  This Court has jurisdiction over the subject matter of THE FEDERAL FALSE CLAIMS ACT action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has jurisdiction over the subject matter of the TEXAS FALSE CLAIMS ACT action pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b) because the TEXAS FALSE CLAIMS ACT action arises from the same transactions or occurrences as the FEDERAL FALSE CLAIMS ACT action.


7. Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) one or more of the Defendants reside in this district; (ii) one or more of the Defendants transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) the Defendants committed acts prohibited by 28 U.S.C. § 3729—which are acts giving rise to this action within this district.


## III. CONDITIONS PRECEDENT

8. Before filing this Complaint, Relators served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information they possess, pursuant to the requirements of 31 U.S.C. §3730(b) (2) of the FEDERAL FALSE CLAIMS ACT and upon the State of Texas pursuant to the TEXAS FALSE CLAIMS ACT, Chapter 36.102(a) of the Texas Human Resources Code. The Relators have previously made the required disclosure ("Disclosure Statement") to the U.S. Government and the State of Texas by providing to the U.S. Attorney for the Eastern District of Texas and the Attorney General of the State of Texas a copy of this Complaint and a statement of all material

information relative to this Complaint. The Disclosure Statement consists of Affidavits of the Relators and exhibits thereto and other evidence submitted is supported by material evidence and information known to the Relators at the time of their filing, establishing the existence of Defendants' False Claims. Because the information provided includes attorney-client communications and work product of Relators' attorneys, and is submitted to the Attorney General of the United States, the U.S. Attorney for the Eastern District of Texas, and the Attorney General of the State of Texas in their capacity as potential co-counsel in the litigation, the Relators understand that the Disclosure Statement is confidential. Relators have complied with all other conditions precedent to bringing this action.

9.   Relators do not believe that any of the information upon which they base their allegations is the subject of public disclosure. In the unlikely event the Court were to deem that certain information has been publicly disclosed, Relators are nevertheless the original source of, and have direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and have voluntarily provided such information to the federal and state governments before filing this action.

## IV. PARTIES

10. Relators are citizens of the State of Texas. During the years 2000-2010, Relators were collectively employees of Irving Holdings, Inc, d/b/a Yellow Cab (hereinafter "Yellow Cab"). Relator Spence was a Medicaid driver for Yellow Cab from 2001-2009. Relator Mike Jones was Medicaid Compliance Officer for Yellow Cab from February 2002 until August 31, 2005. Relator Cheryl Jones was in charge of scheduling Medicaid trips for Yellow Cab for 10 years from 2000 until 2010. All Relators have direct, independent and personal knowledge of the fraud perpetrated by Yellow Cab during the time of their respective employment. The Relators bring this action based upon their direct, independent, and personal knowledge.

11. The U.S. Government and State of Texas fund certain health care services through Medicaid and Medicare when those services are determined to be medically necessary in compliance with regulations of the U.S. Government and State of Texas, as well as state and federal laws pertaining to payment and/or reimbursement for Medicare and Medicaid health care

expenses. Medicare and Medicaid regulations provide that if a person needing health care is unable to travel or does not have transportation, then the government will provide transportation to said patients under very strict guidelines.

12. The Defendants represented to the U.S. government and State of Texas that they would comply with these Medicaid and Medicare guidelines for reimbursement, but the Defendants instead materially breached the very medical transportation contracts ("MTP Contracts") that were awarded to them by the State of Texas to provide transportation services to Medicare and Medicaid patients. Moreover, the Defendants made false statements to the State of Texas in their response to the State's request for proposal to obtain said initial MTP Contract for the first 3 year period of the MTP Contract, and for each of the subsequent renewals of said contract for the time period 2000-2012.

13. As set forth below, Relators are aware of multiple False Claims, as defined herein, whereby Medicare and Medicaid were fraudulently billed by the Yellow Cab Defendants to the U.S. Government and the State of Texas. In fact, Plaintiffs submit that virtually EVERY claim for transportation services submitted by the Defendants during several years of the MTP Contracts was arguably a False Claim, therefore entitling the U.S. Government and State of Texas to hundreds of millions if not billions of dollars in recovery from the Defendants for civil damages and penalties for the claims submitted.

14. Defendant IRVING HOLDINGS, INC d/b/a YELLOW CAB and BUSINESSEXEC SEDAN SERVICE ("Yellow Cab") is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jack Bewley, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

15. Defendant NORTH TEXAS OPPORTUNITY FUND, L.P. ("NTOF") is a domestic Limited Partnership organized under the laws of the State of Texas which owns 37.5% of Yellow Cab. Its registered agent for service of process is Arthur Hollingsworth, who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240.

16. Defendant NORTH TEXAS OPPORTUNITY FUND CAPITAL PARTNERS LP ("NTOF Partners") is the general partner of NTOF. NTOF Partners is a foreign limited

partnership organized under the laws of the State of Delaware, and has transacted business in the State of Texas and maintains its principle place of business in Dallas, Texas. Its registered agent for service of process is Arthur Hollingsworth, who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240.

17.   Defendant NTOF LLC (″NTOF LLC″) is the general partner of NTOF Partners. NTOF LLC is a foreign limited liability company organized under the laws of the State of Delaware, and has transacted business in the State of Texas and maintains its principle place of business in Dallas, Texas. Its registered agent is Gregory A. Campbell who may be served with process at 2626 Howell, Suite 700, Dallas, TX 75204. Defendants Arthur W. Hollingsworth (″Hollingsworth″), Gregory A. Campbell ("Campbell″), and Luke M. Sweetser (″Sweetser″) were and/or currently are all managers of NTOF LLC at the times relevant to this action.

18.   Defendant 3 NORTH TEXAS INVESTMENT ADVISORS LLC (″NTI Advisors") which does business under an assumed name of NTIA - Opportunity Fund, LLC  is the investment manager of NTOF. NTI Advisors is a foreign limited liability company organized under the laws of the State of Delaware, and has transacted business in the state of Texas and maintains its principle place of business in Dallas, Texas. Its registered agent for service of process is Arthur Hollingsworth, who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240. Defendants Hollingsworth, Campbell,  and  Sweetser were and/or currently are all managers of NTI Advisors at the times relevant to this action.

19.   Defendant LONE STAR INVESTMENT ADVISORS, LLC, is a domestic limited liability company organized under the laws of the State of Texas, which upon information and belief, owns an interest in NTOF. Its registered agent for service of process is Arthur Hollingsworth, who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240.

20.   Defendant DALLAS CAR LEASING, LLC is a domestic limited liability company organized under the laws of the State of Texas. Its registered agent for service of process is Jack Bewley, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

21. Defendant YELLOW CHECKER CAB OF DALLAS, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jack Bewley, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

22. Defendant YELLOW CHECKER CAB OF FORT WORTH, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jack Bewley, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

23. Defendant BIG TEX TAXI CORPORATION is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

24. Defendant TERMINAL TAXI CORPORATION is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

25. Defendant TERMINAL TAXI CORPORATION OF IRVING is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

26. Defendant CHOICE CAB, INC.  is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

27. Defendant CLASSIC SHUTTLE ACQUISITION CORPORATION, INC. D/B/A GO YELLOW CHECKER SHUTTLE is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

28. Defendant JETTAXI, INC. is a domestic corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

29. Defendant us CAB, LLC is a domestic limited liability corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

30. Defendant DALLAS TAXI, LLC is a domestic limited liability corporation organized under the laws of the State of Texas. Its registered agent for service of process is Jeff Finkel, who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

31. Defendant JEFF FINKEL ("Finkel") is an individual who owns a 10.8% interest in Yellow Cab, and who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

32. Defendant JACK BEWLEY ("Brewely") is an individual who owns a 9.2% interest in Yellow Cab, and who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

33. Defendant WILLIAM TAUSCHER ("Tauscher") is an individual who owns a 40% interest in Yellow Cab, and who may be served with process at 2515 Irving Blvd., Dallas, TX 75207.

34. Defendant ARTHUR HOLLINGSWORTH ("Hollingsworth") is an individual who owns a 2.5% interest in Yellow Cab, and who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240.

35. Defendant GREG CAMPBELL ("Campbell") is an individual who may be served with process at 2626 Howell, Suite 700 Dallas, TX 75204.

36. Defendant LUKE SWEETSER ("Sweetser") is an individual who may be served with process at 13355 Noel Road, Suite 1750, Dallas, TX 75240.

## V. FACTS

### A. OVERVIEW

37. **This case involves perhaps the largest case of Medicare and Medicaid fraud in the history of the State of Texas and perhaps the entire United States, as the damages and civil penalties under THE FEDERAL FALSE CLAIMS ACT and TEXAS FALSE CLAIMS ACT total HUNDREDS OF MILLIONS OF DOLLARS AND FOR SOME YEARS BILLIONS OF DOLLARS--PER YEAR-- for almost 12 years!**

38. Yellow Cab is one of the largest transportation companies in the world and is the largest of its kind in the entire United States. It is owned 37.5% by North Texas Opportunity Fund, 40% By William Tauscher, 10.8% by Jack Finkel, 9.2% by Jack Bewley, and 2.5% by Arthur Hollingsworth, President of North Texas Opportunity Fund. The Board of Directors of Yellow Cab is comprised of Defendants William Tauscher, Jack Finkel, Jack Bewley, and Arthur Hollingsworth.

39. In addition to its fleet of Yellow Cabs for hire to provide regular taxi service, Yellow Cab has an extensive medical transportation business to transport Medicare and Medicaid patients ("Beneficiaries") to and from doctor visits. Defendant Yellow Cab and/or its affiliates or predecessors first obtained a Medical Transportation Contract ("MTP Contract") with the State of Texas beginning in approximately 1999 to provide transportation services for beneficiaries who allegedly did not have means of transportation to go to a doctor or other healthcare provider. At first the contracts were administered by the Texas Department of Transportation ("TxDOT"), and thereafter beginning in 2008 by the Texas Department of Health and Human Services ("HHSC").

40. Defendants LONE STAR ADVISORS, HOLLINGSWORTH,  CAMPBELL AND SWEETSER formed Defendant NORTH TEXAS OPPORTUNITY FUND, L.P. in 2000. Defendant NTOF Partners is the general partner of NTOF. Defendant NTOF LLC is the general partner of NTOF Partners. DEFENDANT NTI ADVISORS D/B/A NTIA - OPPORTUNITY FUND, LLC is the investment manager to NTOF.

41. NTOF postured itself in the press as: "a unique, private equity fund that seeks to make equity investments in North Texas companies that are located in or willing to expand operations to underserved areas in North Texas, with a special emphasis on the southern sector of Dallas, or minority or women owned or managed companies located anywhere in North Texas." In 2001, NTOF invested $4 Million in Yellow Cab for a 40% stake-- 37.5% was owned by NTOF and 2.5% was owned by Hollingsworth individually. Notably, the owners of Yellow Cab were caucasian and it was never owned by minorities or women.

42. The owners of 80% of Yellow Cab graduated from either Harvard or Yale. William Tauscher has a B.S. Degree from Yale. Defendant Hollingsworth earned an undergraduate degree in Economics from Harvard University and has served as Chairman of the Harvard Club of Dallas. He is an inductee in the Harvard Varsity Club Hall of Fame and is a Harvard College Scholar. He is a past Chairman of the North Dallas Chamber of Commerce. Defendant Sweetser also holds an undergraduate degree from Harvard University and he is also a Harvard College Scholar. Defendant Greg Campbell is also Harvard educated, having obtained his MBA from Harvard. Suffice it to say that these four owners of an interest in Yellow Cab had the requisite educational background and knowledge to detect Medicaid and Medicare fraud in one of their companies in which they had made a major investment. This was especially true of Defendants Tauscher and Hollingsworth, who sat on the board of directors of Yellow Cab.

43. The Medicare and Medicaid fraud committed by Yellow Cab was rampant from the start. Each of the three Relators got a first-hand view of the fraud from differing perspectives. Relator Robert Spence ("Relator Spence") was a Medicaid driver for Yellow Cab from 2001-2009 and was prominent within the company as he even did TV commercials for the company and was the only driver allowed to attend corporate functions with top executives of the company.  He was fired in 2009 after an automobile accident. He observed the fraud being perpetrated from his perspective as a Medicaid transportation driver, the manner in which he was "paid" with a 2-check system each week, how he was given only one of the two checks, and how the other "pay check" was stamped "for deposit only" and was deposited into the account of Yellow Cab!!

44. Relator Mike Jones was the Medicaid Compliance Officer for Yellow Cab from February 2002 until August 31, 2005. His job was to find Medicaid fraud which he did almost every day, and he recorded the fraudulent activity in a journal which is part of Relators' submission to the U.S. Attorney and the Attorney General for the State of Texas. When Relator Mike Jones found too much fraud, he was terminated, and the company never hired another Medicaid Compliance Officer because they no longer wanted to have written records of the Medicaid fraud.

45. Relator Cheryl Jones, who is married to Relator Mike Jones, was in charge of scheduling Medicaid trips for Yellow Cab for 10 years from 2000 until 2010, and was fired the day her mother (a Medicaid driver for Yellow Cab) filed a lawsuit against Yellow Cab in 2010 for underpayment of wages. She had the unique perspective of observing the day in and day out actions of Liz George ("George"), CFO and controller of the company, who participated in the commission of Medicaid fraud on a daily basis. She observed the "handling" of funds by George, and has copies of multiple incriminating financial documents prepared by George which are also part of Relators' submission to the U.S. Attorney General, the United States Attorney for the Eastern District of Texas, and the Attorney General for the State of Texas. Cheryl Jones also observed the fraud personally on the trip sheets Yellow Cab drivers would turn in for trips that she had scheduled for the Medicaid drivers.

### B. DRIVERS REPEATEDLY GOT FINED $500 FOR COMMITTING MEDICAID FRAUD BUT THE DEFENDANTS KEPT THE MONEY FOR THE FRAUDULENT CLAIMS SUBMITTED, AND DIDN'T REPORT THE DRIVERS' FRAUD TO THE TEXAS HHSC AS THE DEFENDANTS REPRESENTED TO THE STATE OF TEXAS THEY WOULD DO!

46. Certain drivers of Yellow Cab were designated within the company to be Medicaid drivers. Each of these Medicaid drivers from the inception of the MTP Contracts were required to sign an acknowledgement that they had received the then current Medicaid Training Manual for Yellow Cab ("Medicaid Manual"). The Medicaid Manual was revised by Yellow Cab from time to time to allegedly comply with changing Medicare and Medicaid regulations (among other reasons), with revisions on March 13, 2003, November 21, 2006, and June 27, 2009. The one thing that remained constant, however, is that the drivers were informed in writing in the

Medicaid Manual that if they committed Medicaid Fraud, then they would be fined $500 and that committing Medicaid fraud "will result in immediate termination." There were also fines set forth in the Medicaid Manual other violations (which were also Medicaid fraud) for example, there was a $200 fine for having the patient sign for the A (originating) trip and the B (return) trip at the time of pickup rather than waiting to have the patient sign the B trip form after returning home.

JEFF FINKEL SENT MEMOS TO ALL MEDICAID DRIVERS STATING THAT **IF YOU COMMIT FRAUD WE ARE TURNING YOU IN TO THE STATE FOR PROSECUTION**, **YOU WILL GET JAIL TIME**, THERE WILL BE NO SECOND CHANCES AND **YOU WILL BE TERMINATED**, BUT DID HE MEAN IT?

47. From the beginning, Medicare and Medicaid fraud was rampant at Yellow Cab to the point that Jeff Finkel had to send out a memo to all Medicaid drivers dated July 5, 2002, a copy of which is attached hereto as Exhibit "A" and incorporated by reference. Significantly, the memo tells everyone in the company that:

> "**Yellow Cab will report any driver committing fraud…Medicaid has indicated they will prosecute any drivers committing fraud…There will be no second chances…. If you cheat you will be out, fined, and turned over for prosecution. There will be no exceptions to the guidelines listed above**."(emphasis added)

48. What an absolute joke that memo would turn out to be! The same is true of subsequent similar memos sent out by Finkel to ALL MEDICAID DRIVERS. In another memo dated July 11, 2003 with a subject line **"Immediate Action Items. READ IT!!"  (emphasis in original),** a copy of which is attached hereto as Exhibit "B" and incorporated by reference, Finkel stated that:

> "Medicaid has started an investigation on several drivers regarding fraudulent pharmacy trips. With the new legislation that has recently passed, **Medicaid is required to pursue legal action against any driver committing fraud. This is a federal crime** which will carry **mandatory jail sentencing**. You have been notified!... Pharmacy trips are being turned in with clients stating that the drivers told the clients they can go to a pharmacy or to a store and pick up wire transfers or go shopping. **This is fraud!!!!**
>
> **We will help and provide all documentation to prosecute offenders to protect the company.** If you are caught you **will be terminated** without any chance of returning. You have been warned. All out of town pharmacy trips are being reviewed for this **fraud.**

You are guaranteed you will get caught. **Don't be stupid!!!** Again, you are guaranteed you will be caught. (emphasis added)

49. Apparently, the warnings fell on deaf ears, as again on October 15, 2003,. Finkel had to send yet another memo to "All Medicaid Drivers" with the subject line "**Fraud**". A copy of same is attached hereto as Exhibit "C" and incorporated by reference. In Exhibit "C", Finkel again stated to his drivers that:

> "To charge for a false pharmacy trip is **fraud**!!!!!... **I am very disappointed to find out that we have drivers reporting pharmacy trips that did not happen**. For those of you who have decided to take this action…you will be charged back the value of the pharmacy trip and a $100 fine for every false pharmacy trip. If it happens a second time in the future the fine will be $500 and **you will be terminated from the program**." (emphasis added)

50. Despite all of the warnings, Medicaid fraud continued to be rampant within the company to the point that Medicaid drivers thought it was acceptable to commit fraud to make ends meet. In 2004, however, Finkel tried again. This came 5 days after a very revealing e-mail dated April 15, 2004, a copy of which is attached hereto as Exhibit "D" and incorporated by reference. Exhibit "D" is an e-mail from George to Finkel and copied to Relator Mike Jones (Medicaid Fraud Compliance Officer) explaining why drivers, like the driver in question -- Ben Ugwah-- "try to get away with fraud." Mr. Ugwah explained why drivers signed the patients' names to trip logs and that was the only way to make enough money, saying "the only way to make money was that drivers need to commit fraud." Mr. Ugwah also stated the obvious-- that Finkel was happy to fine the drivers because "the more often you fine drivers the more money you made." How true indeed! Mr. Ugwah made clear to Relator Mike Jones that from his perspective and that of other Medicaid drivers as well "it was perfectly acceptable for the drivers to commit fraud on an ongoing basis," which is exactly what they were doing.

51. Soon after this encounter, Finkel got all Medicaid drivers to sign his infamous April 20, 2004 memo, a copy of which is attached as Exhibit "E" and incorporated by reference. In this memo with a subject line of "Proper paperwork/fraud", Finkel stated:

> In the past week I have been **called to the carpet for fraud** by three of our drivers…All three of these fraudulent acts were caught by the Medicaid staff in the regional office… we are turning the names of the individuals over to [the State] to prosecute and protect

the company…**The fine is $500 and termination**…. **Any fraud will be grounds for immediate termination from Medicaid** and there are no excuses which will stop this from happening. Check your paperwork and **don't cheat**.

52. This form the drivers had to sign in 2004 (and the same or similar form thereafter for new Medicaid drivers) also provided that they would be fined $50 and not paid for any trip where the driver would change the price of the trips on the run sheet. This was true even if the driver discovered that Medicaid was being overbilled because the trip should not cost as much as what was reflected on the trip run sheet. Once when Relator Spence, a Medicaid driver for the company for many years, struck through the higher dollar amount to be billed to Medicaid and put the correct lower amount on the run sheet so that Medicaid would not be overbilled, he was instructed by the office manager in the Fort Worth office to never again change the amount on the run sheet, even if it resulted in Medicaid being overbilled!

53. Drivers were also instructed to write their mileage on the front cover of the run sheets from the time they left their house until the time they returned home. Per Medicaid guidelines, however, the trip sheet is supposed to contain the beginning and ending mileage from the pickup and drop-off locations. Drivers were fined $50 if they did not write down ALL of the mileage on the trip sheets, instead of only those miles that were driven for a given beneficiary as was required under Medicaid guidelines.

54. In October of 2004, Mr. Finkel sent out yet another memo to all Medicaid drivers, stating that "I have received more complaints this week than I have received in most months regarding poor Medicaid service. … There is an automatic fine of $500 for failure to have your MDT on."

55. As it turned out, all of the threats made by Finkel were simply window dressing to make it appear that he cared about the fraud taking place. While he did fine drivers for committing Medicaid fraud, he never reported the drivers to the State for prosecution as he said he would, but more importantly for purposes of this case, he never reported the Medicaid fraud to the State of Texas or reimbursed the State of Texas for the fraudulent Medicaid claims for which he fined his drivers!

### C. RELATOR MIKE JONES, MEDICAID COMPLIANCE OFFICER, GOT FIRED BY IRVING HOLDINGS FOR DETECTING TOO MUCH FRAUD??

56. Because of all of the fraud that was taking place, Yellow Cab hired Relator Mike Jones in February of 2002 to be its Medicaid Fraud Compliance Officer. In that capacity, he actually kept a handwritten list of the drivers who committed Medicaid Fraud and the reason for same, as well as the amount of the fine imposed. Attached hereto as Exhibit "F" is a list of some of the drivers committing Medicaid fraud, and the reasons why their conduct constituted Medicaid fraud. Despite the multiple warnings set forth above from Finkel, many times the same drivers would repeatedly commit Medicaid fraud --one driver as many as 9 times--and still would not be reported to the State of Texas or terminated as Finkel promised the State of Texas as well as having "threatened" his drivers that he would do so!

57. Significantly, in order to determine how much to fine the drivers for committing Medicaid fraud, Relator Mike Jones would check with either Finkel, Vice-President of Yellow Cab, or Liz George, CFO and Controller, who would tell Mike Jones how much to fine the driver and Mike Jones would record same on Exhibit "F" as referenced by the multiple notations of "$500 fine per Jeff" or "$500 fine per Liz" on Exhibit "F". This obviously reveals first-hand knowledge by Finkel, Vice-President of Yellow Cab, of hundreds of instances of Medicaid fraud, yet he still did not inform the State of Texas as he represented he would do on multiple occasions when Yellow Cab obtained the MTP Contracts. Instead, he would fine the driver (usually $500), and Yellow Cab would keep the fine money (and put it into a slush fund and "make it disappear"--more on that later), Yellow Cab would keep the money billed to Medicaid for the False Claims involved, and did NOT report the fraud to the State of Texas or terminate the driver. At most, a driver would be suspended and then later allowed to return to work. The Defendants wanted to make the money from Medicare and Medicaid so bad that they "looked the other way" and accepted the payments for trips that the Defendants knew were never taken and/or constituted Medicaid fraud.

58. Relator Mike Jones was dogged in pursuit of Medicaid fraud and was good at his job-- in fact Yellow Cab thought he was doing "too good of a job" of rooting out Medicaid fraud that it got him fired! The problem was that Relator Mike Jones found that Medicaid fraud was being

committed almost every day, and that it was increasing as time went on! Even when he detected fraud and reported it, however, Finkel and George would overlook it -- they would fine the driver but still let the driver continue to operate as a Medicaid driver. The Defendants NEVER reimbursed Medicaid for claims that they submitted involving Medicaid fraud.

59. Exhibit "F" contains a plethora of False Claims by the Medicaid drivers of Yellow Cab. Most of the False Claims Mike Jones observed were drivers not taking a patient to the doctor but getting the patient to sign the paperwork anyway saying that they were transported to the doctor when in fact they did not go. Sometimes drivers would actually pay the patient who was to be transported $5-10 to sign saying that they were taken to the doctor when they were not so that they could turn in a $26 round trip that NEVER OCCURRED!

60. In the course of his duties, Relator Mike Jones also discovered multiple instances where the company had been paid for a claim twice or even three times by the State of Texas among others. When he would point this out to George, Controller of Yellow Cab, her response would be "If they're [the State of Texas] too stupid to pay a claim twice I'm going to put that money into Account 4000 and make it disappear!" Account 4000 was a slush fund used by the company which contained money that should have been reported as income to the IRS, but taxes were not paid on monies put into that account.

61. Despite the fact that the money attributable to fines being given to Medicaid drivers committing fraud should have been categorized as income, the Defendants did NOT pay taxes on the money received for fines for Medicaid fraud committed by their drivers. The money was deposited into one or more accounts of Yellow Cab.

### D. THE FRAUDULENT MISREPRESENTATIONS MADE BY THE DEFENDANTS TO INDUCE THE STATE OF TEXAS TO AWARD MTP CONTRACTS TO YELLOW CAB

62. In order to obtain MTP contracts with the State of Texas beginning in 1999 and subsequent renewals thereof (in 2003, 2006 and 2009), the Defendants made glaringly fraudulent misrepresentations to the State of Texas to obtain said contracts and renewals thereof. While the base value of the contracts was $18 Million per year, with add-ons (such as trips for x-rays, a

pharmacy trip needed after a doctor visit, etc.) the contracts were actually worth $40-50 Million per year!

### 1. MISREPRESENTATION AS TO REQUIREMENT OF MEDICAID DRIVERS TO ATTEND MEDICAID TRAINING SCHOOL--WHAT MEDICAID DRIVER'S TRAINING SCHOOL?

63. One example of the multiple misrepresentations to the State of Texas was the Defendants' representation to the State of Texas that ALL drivers had to go through their Medicaid training school in order to become a Medicaid driver when in fact **THERE WAS NO MEDICAID TRAINING SCHOOL WHATSOEVER--EVER!** The Defendants represented that the "driver's training school" took place on Tuesdays , Thursdays, and Saturdays, 52 weeks a year, knowing full well that there was NEVER a Medicaid training school of any kind!

### 2. MISREPRESENTATION THAT IRVING HOLDINGS DID CRIMINAL BACKGROUND CHECKS ON ALL MEDICAID DRIVERS

64. Specifically, in order to obtain a renewal of its contract with the State of Texas, on January 17, 2006, Yellow Cab signed and submitted an execution of proposal to the State of Texas which reflected that "All statements and information prepared and submitted in response to this RFP are current, complete, and accurate." At that time, Yellow Cab was the third largest for profit transportation company in the U.S. In glaring misrepresentations, one after the other, Yellow Cab represented that:

> "Irving Holdings operates a comprehensive driver training school 52 weeks per year. All Irving Holdings drivers must attend and pass this school before they are ever allowed to drive… All driver candidates must pass a State of Texas certified Defensive Driving Class, and pass a mandatory drug test **and criminal background check before they become an Irving Holdings driver.**"

65. **EACH AND EVERY REPRESENTATION IN THE FOREGOING QUOTATION (other than some drug testing) IS COMPLETELY AND UTTERLY FALSE!! There was NO driver training school--EVER (much less 52 weeks per year!!) and there were NO CRIMINAL BACKGROUND CHECKS--EVER--as of that point in time. Yet the Defendants hoodwinked their way into yet another extension of their lucrative $40-**

---

**50 Million per year Medicaid contract for another 3 years as a result of these flagrant misrepresentations!!**

66. Ironically, as part of its proposal to the State of Texas, Yellow Cab publicized to the State of Texas in order to get this lucrative contract renewed that it had been awarded the Small Company of the Year Award for 2005 by the **NORTH** Dallas Chamber of Commerce. Upon information and belief, the North Texas Opportunity Fund, L.P. got a grant of federal money to invest in underprivileged sections of the community in minority and/or women owned businesses, yet it invested $4 Million in one of the largest transportation companies in the entire U.S. and certainly the largest in Texas which was not owned by a minority or women. The "underprivileged" company that North Texas Opportunity Fund invested in was so "underprivileged" that it is the subject of a major antitrust case currently pending against it because it allegedly monopolizes the DFW and surrounding area transportation market.

### 3. MISREPRESENTATION THAT THEY WOULD REPORT MEDICAID FRAUD TO THE STATE-- "WE WILL JUST KEEP THAT FINE MONEY AND KEEP OUR MOUTH SHUT"

67. The Defendants further represented to the State of Texas that any of their drivers found committing Medicaid fraud would be reported to the State of Texas and turned over for prosecution. As but one example, Specification No. of the TxDOT 952-94 dated October 2005, Section 10.8.7 required Irving Holdings to "**REPORT ALLEGATIONS OF FRAUD OR PROGRAM ABUSE**."(Emphasis added.) Instead of reporting the fraud as required by TxDOT, the **Defendants fined their drivers (in most cases $500!) for committing Medicaid fraud, kept the money for themselves, did not reimburse the State of Texas for the False Claim at issue, and NEVER REPORTED THE MEDICAID FRAUD TO THE STATE OF TEXAS AS THEY REPRESENTED THEY WOULD!** Medicaid fraud was rampant throughout the company, and the Defendants knew that if they reported the extent of fraud committed by their drivers that their MTP Contract would be terminated and/or certainly would not have been renewed.

### 4. MISREPRESENTATIONS OF QUALIFICATIONS AND
### RESPONSIBILITIES OF KEY PERSONNEL AS TO THEIR
### ROLE IN ADMINISTERING THE MEDICAID MTP CONTRACT

68. In order to obtain a renewal of the MTP Contract in 2006, the Defendants also submitted a proposal to the State of Texas containing representations regarding its key management. As it pertains to Mike Rice, Operations Manager, the Defendants represented to the HHSC that Mr. Rice was in charge of scheduling, dispatch, client intake, maintenance, driver personnel management, and that he was responsible for the day to day management and supervision of the Medicaid transportation company on behalf of Yellow Cab. By Mr. Rice's own admission, however, he never held any of those positions as it pertained to Medicaid!

### E. WE DON'T DO CRIMINAL BACKGROUND CHECKS
### ON OUR DRIVERS --UNLESS THEY SUE US!

69. Another misrepresentation made by Yellow Cab to fraudulently obtain the MTP contracts worth $40-50 million per year was that the Defendants represented in writing to the State of Texas that they performed criminal background checks on ALL Medicaid drivers, when in fact for the first 8-9 years of the MTP Contract from 2000-2009 there were NO CRIMINAL BACKGROUND CHECKS OF ANY KIND DONE!

70. TxDOT issued its "Request for Proposal, Medicaid Transportation Program, Statewide Transportation Services" in October 2005 for the term of said contract to begin June 26, 2006 until June 25, 2009, which contract was awarded to Yellow Cab for 3 regions covering an approximate 30 county area of North Texas. ("2006 MTP Contract").  TxDOT assigned the 2006 MTP Contract to the Texas Department of Health and Human Services ("HHSC") effective May 1, 2008.

71. On July 13, 2009, Amendment One to the Medical Transportation Services Agreement between HHSC and Yellow Cab was executed and which extended the HHSC-- Yellow Cab contract terms from June 26, 2009 until August 31, 2010, with an option for an additional 18 month extension ("2009 MTP Contract Amendment"). A copy of said 2009 MTP Contract Amendment is attached hereto as Exhibit "G" and incorporated by reference. The 2009

MTP Contract Amendment incorporated changes required by the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services as required by Title 42, Public Health 455.1 enacted in 2007, which provides as follows:

> This part sets forth **requirements for a State fraud detection and investigation program**, **and for disclosure of information on ownership and control.**
> (a) Under the authority of sections 1902(a)(4), 1903(i)(2), and 1909 of the Social Security Act, Subpart A provides State plan requirements for the identification, investigation, and referral of suspected fraud and abuse cases. In addition, the subpart **requires** that the State—
> > (1) **Report fraud and abuse information to the Department**; and
> > (2) **Have a method to verify whether services reimbursed by Medicaid were actually furnished to recipients.**
> (b) Subpart B implements sections 1124, 1126, 1902(a)(36), 1903(i)(2), and 1903(n) of the Act. It requires that providers and fiscal agents must agree to disclose ownership and control information to the Medicaid State agency.
> (c) Subpart C implements section 1936 of the Act. It establishes the Medicaid Integrity Program under which the Secretary will promote the integrity of the program by entering into contracts with eligible entities to carry out the activities of subpart C.
> [51 FR 34787, Sept. 30, 1986, as amended at 72 FR 67655, Nov. 30, 2007] (emphasis added)

72. One of the significant changes was that Section 10.4.6.2.2 required that Yellow Cab obtain from all of its drivers a signed statement acknowledging that they had never been convicted of a felony OR misdemeanor, or that if they had, the felony or misdemeanor "must be disclosed". Section 10.8.13 of the 2006 MTP Contract required the disclosure of all convictions of Medicaid drivers within 10 days of the conviction to the HHSC. The Amendment further provided that no driver who had a felony or misdemeanor conviction for the preceding seven year period was eligible to drive for Medicaid (Section 10.4.6.2.3). Moreover, Section 10.4.6.2.5 provided that:

> If HHSC determines that an employee, subcontractor, or subcontractor employee provided services under this Contract for any period prior to completion of the required checks as required above, **HHSC MAY REQUIRE REPAYMENT OF EXPENDITURES CLAIMED FOR THE PERIOD THE REQUIRED CHECKS HAD NOT BEEN COMPLETED.** (emphasis added)

73. As of the date of the 2009 MTP Contract Amendment, Yellow Cab had multiple drivers who had been convicted of felonies and misdemeanors, but failed to disclose these

convictions to the State of Texas! The one and only conviction reported to the State of Texas was when a Plaintiff in a FLSA lawsuit sued Yellow Cab in 2010, and the company retaliated by firing him ostensibly because he had a conviction. The company knew about the driver's conviction all along, and had allowed the driver in question to continue to drive for Medicaid, until such time as the driver sued the company, and only then was the conviction disclosed to Medicaid. Even Jeff Finkel had an earlier conviction that should have been reported under these guidelines but was not.

74. Because of the Defendants failure to comply with Section 10.4.6.2.5 above, ALL CLAIMS SUBMITTED BY YELLOW CAB FROM THE DATE OF THE 2009 MTP CONTRACT AMENDMENT UNTIL THE CONCLUSION OF THE CONTRACT WERE FALSE CLAIMS AND SHOULD BE REIMBURSED TO THE STATE OF TEXAS AND PENALTIES ASSESSED BASED UPON THOSE CLAIMS!

### F. CATCH US IF YOU CAN! -- YOU CAN CHANGE THE REGULATIONS ALL YOU WANT BUT WE ARE GOING TO IGNORE OR CIRCUMVENT THEM-- ALL WE HAVE TO DO IS FORM ANOTHER CORPORATION!!

75. Medicaid has changed its regulations over the years regarding the requirements that had to be met in order to become a Medicaid Transportation contractor for the state of Texas. One significant change was that effective June 1, 2006, Medicaid implemented an Amendment to its MTP contract which required that Yellow Cab NOT have any ownership interest whatsoever in the automobiles that were used for transporting beneficiaries due to potential conflicts of interest ("2006 MTP Contract Amendment"). Specifically, Section 28.a.7. of the 2006 MTP Contract Amendment entitled "Transportation" states that in order to be a MTP broker (i.e. for Yellow Cab to even be entitled to enter into a MTP Contract with the State of Texas), the broker (Yellow Cab) cannot own its own vehicles and provide transportation services, except through independent contractors who own their own vehicles. The 2006 Contract Amendment states that a MTP broker cannot:

> "itself [be] a provider of transportation nor [can] it refer to or subcontract with any entity with which it has a prohibited financial relationship as described at 45 CFR 440.170(4)(ii)."

---

Despite this prohibition, for 4 1/2 years after this rule went into effect, Yellow Cab continued to own an interest in most of the automobiles in question, directly and/or indirectly. After the new rule went into effect, Yellow Cab represented to the State of Texas that Yellow Cab had NO FINANCIAL OWNERSHIP interest in the cars in order to keep and obtain renewals of its contract with the State of Texas. During this time, approximately 2/3rds of the drivers leased their cars and the other 1/3rd "purchased" their cars and made payments to Yellow Cab. Yellow Cab represented to the State of Texas in its proposal to renew the contract in 2006 that ALL of the drivers for Medicaid owned their own vehicles, when in reality only 1/3rd of the drivers owned their own vehicles!

76. The 2009 MTP Contract Amendment changed the regulations regarding financial disclosure requirements by adding more restrictions. Section 10.8.12 was amended to provide that Yellow Cab must disclose "information on ownership and control, information related to business transactions and information on persons convicted of crimes…" To that end, the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services("CMS")  implemented new regulations effective January 20, 2009 prohibiting conflicts of interest in terms of ownership of the vehicles used to transport Medicare and Medicaid patients to try to prevent fraud and abuse. This regulation was based upon an amendment on December 19, 2008 to 42 CFR Part 440, which prohibited any financial relationship which included "any direct or indirect ownership or investment interest in an entity that furnishes designated health services and any direct or indirect compensation arrangement with an entity that furnishes designated health services."

77. 42 CFR Part 440, Section 440.170 (a)(4)(D) as amended in December 2008 expressly provides  that NEMT services can only be provided as follows:

> (4) Non-emergency medical transportation brokerage program. At the option of the State, and notwithstanding §431.50 (statewide operation) and §431.51 (freedom of choice of providers) of this chapter and §440.240 (comparability of services for groups), a State plan may provide for the establishment of a non-emergency medical transportation brokerage program in order to more cost-effectively provide non-emergency medical transportation services for individuals eligible for medical assistance under the State plan who need access to medical care or services, and have no other means of transportation. These transportation services include wheelchair vans, taxis, stretcher cars, bus passes and tickets, secured transportation containing an occupant protection system that addresses

safety needs of disabled or special needs individuals, and other forms of transportation otherwise covered under the state plan.

(i) Non-emergency medical transportation services may be provided under contract with individuals or entities that meet the following requirements:

(A) Is selected through a competitive bidding process that is consistent with 45 CFR 92.36(b) through (i) and is based on the State's evaluation of the broker's experience, performance, references, resources, qualifications, and costs.

(B) Has oversight procedures to monitor beneficiary access and complaints and ensure that transportation is timely and that transport personnel are licensed, qualified, competent, and courteous.

(C) Is subject to regular auditing and oversight by the State in order to ensure the quality and timeliness of the transportation services provided and the adequacy of beneficiary access to medical care and services.

(D) **Is subject to a written contract that imposes the requirements related to prohibitions on referrals and conflicts of interest described at §440.170(a)(4)(ii), and provides for the BROKER to be <u>LIABLE FOR THE FULL COST OF SERVICES RESULTING FROM A PROHIBITED REFERRAL OR SUBCONTRACT.</u>**

(ii) Federal financial participation is available at the medical assistance rate for the cost of a written brokerage contract that:

(A) Except as provided in paragraph (a)(4)(ii)(B) of this section**, prohibits the broker (including contractors, owners, investors, Boards of Directors, corporate officers, and employees) from providing non-emergency medical transportation services or making a referral or subcontracting to a transportation service provider if:**

( *1* ) **The broker has a financial relationship with the transportation provider** as defined at §411.354(a) of this chapter with "transportation broker" substituted for "physician" and "non-emergency transportation" substituted for "DHS"; or

( *2* ) The broker has an immediate family member, as defined at §411.351 of this chapter, that has a direct or indirect financial relationship with the transportation provider, with the term

"transportation broker" substituted for "physician." (emphasis added)

78. In conformity with the passage of the amendment to 42 CFR Part 440, the 2009 MTP Contract Amendment also required that there be transportation brokers for non-emergency transportation for Medicare and Medicaid beneficiaries, and that the broker had to be an "independent entity, in that the broker could not itself provide transportation under the contract with the State and that the broker could not refer or subcontract to a transportation service provider with which it has certain financial relationships…" The reason for these changes was stated in the Amendment to avoid conflicts of interest where, for example, a broker could over utilize higher cost services provided by their own transport companies or possibly bill for services that did not occur and that it was "this potential for fraud and abuse that these prohibitions have been designed to limit."

79. In 2009, the Texas HHSC implemented Rider 55 pursuant to Article II of the Health and Human Services Commission ("Rider 55"), a copy of which is attached as Exhibit "H" and incorporated herein by reference. This Rider required that ALL Medicaid non-emergency transportation companies ("NEMTs") who contracted with the State of Texas had to be transportation brokers. In order to qualify as a transportation broker, the transportation brokers were:

"[P]rohibited from owning or having any financial interest in organizations that deliver NEMT transportation services to eligible clients….**The transportation broker must maintain a separate and distinct relationship with any transportation delivery entity**. **Transportation providers** [i.e., the MTP Contract drivers] are those entities that **own** and operate vehicles engaged in the direct delivery of transportation. (emphasis added)

80. The 2009 MTP Contract Amendment, in compliance with Rider 55, concluded by stating that Medicaid and Medicare transportation services could only be provided pursuant to a contract with a State which:

(D) Is subject to a written contract that imposes the requirements related to prohibitions on referrals and conflicts of interest… and provides for the full cost of services resulting from a prohibited referral or subcontract…

(ii)(A) **Prohibits the broker** (including contractors, owners, investors, Boards of Directors, corporate officers, and employees) **from providing non emergency medical transportation services** or making a referral or subcontracting to a transportation service provider **if (1)  the broker has a financial relationship with the transportation provider…**(emphasis added).

81. As they did with all other changes to regulations, Yellow Cab ignored Rider 55 and the changes implemented in the 2009 MTP Contract Amendment, and fraudulently circumvented and outright violated the provisions regarding prohibiting Yellow Cab from having a financial interest in the MTP vehicles. EACH AND EVERY CLAIM SUBMITTED FROM JUNE 1, 2006 (the effective date of the 2006 MTP Contract Amendment) and/or JULY 26, 2009 UNTIL THE CONTRACT CONCLUDED IN JAUARY 2012 WAS A FALSE CLAIM IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT AND THE TEXAS FALSE CLAIMS ACT BECAUSE THE DEFENDANTS (a) violated Section 28.a.7 of the 2006 MTP Contract Amendment regarding financial ownership of vehicles; and/or (b) violated section 10.8.12 of the 2009 MTP contract amendment. FROM THE DATE THESE 2006 and 2009 CHANGES WERE IMPLEMENTED CONCERNING OWNERSHIP AND CONTROL, THE DEFENDANTS WERE NEVER IN COMPLIANCE WITH SAID PROVISIONS**, RESULTING IN BILLIONS OF DOLLARS IN FALSE CLAIMS FOR DAMAGES AND CIVIL PENALTIES AT $5,500-11,000 PER CLAIM SUBMITTED!!**

82. In fact, the State of Texas notified Jeff Finkel and Yellow Cab via e-mail in December 2009 that as to its 2009 MTP Contract for Region 4, Yellow Cab did NOT meet the standards of a broker as defined in the foregoing statutes BECAUSE Yellow Cab continued to own vehicles after the date of the 2009 MTP Contract Amendment, and further because there was a potential conflict of interest because Yellow Cab was an affiliated company that had a financial interest in the operation of the vehicles.

83. After the passage of Rider 55 and the 2009 MTP Contract Amendment, Yellow Cab was in a real quandary because most of their drivers did NOT own their cars, so how did they "fix" this problem? Here's how. On July 1, 2009, Yellow Cab incorporated another company ironically titled Dallas Car **Leasing**, LLC for the purpose of allowing owners to **"purchase"** vehicles from an affiliated company to purportedly appear to be compliant with Rider 55. They

transferred all of the Yellow Cabs used by Medicaid drivers (which at the time were **painted yellow**) into Dallas Car Leasing, LLC, and **painted them white**! Then they allowed the drivers to "purchase" their vehicles by paying a small down payment and payments each week. Yellow Cab attempted to disguise these true leasing agreements as "purchases" to comply with Medicaid regulations, however, many of the drivers still leased their vehicles for an extended period of time, and the Defendants hid this fact from the Texas HHSC! Amazingly, the same officers of Yellow Cab were listed as members of Dallas Car Leasing, LLC, with the addition of Defendant Hollingsworth as a member of Dallas Car Leasing, LLC who was also on the board of directors of Yellow Cab. There could not be a greater conflict of interest than that, and the Defendants made little if any effort to comply with Rider 55.

84. The terms of Rider 55 were designed to comport with new federal regulations which specifically mandated that THE FEDERAL FALSE CLAIMS ACT would apply to ANY AND ALL CLAIMS submitted and that NO CLAIMS would be allowed to be paid under the Medicaid and/or Medicare programs if a transportation broker-- Yellow Cab-- failed to comply with these requirements. Yellow Cab failed to comply with these requirements because the owners of the Medicaid transportation drivers/providers (Dallas Car Leasing, LLC) were one and the same as the owners of the transportation broker-- Yellow Cab. This was a flagrant conflict of interest as Yellow Cab had a financial interest in Dallas Car Leasing, LLC, which clearly violated the federal and state regulations prohibiting same!

85. Based upon the foregoing, EVERY CLAIM SUBMITTED BY YELLOW CAB FROM AND AFTER THE IMPLEMENTATION OF RIDER 55 SHOULD BE **DISALLOWED** AS A FALSE CLAIM UNDER THE TEXAS FALSE CLAIMS ACT and THE FEDERAL FALSE CLAIMS ACT!! In terms of quantifying the amount of these damages, it is estimated there were conservatively 8 trips a day per driver for 353 drivers for 313 days a year (based on a 6 day work week) which would result in over 883,000 False Claims per year! Each claim submitted to the state averaged $45, so the amount of claims unlawfully billed was approximately $40 Million per year, which when trebled pursuant to THE FEDERAL FALSE CLAIMS ACT and/or TEXAS FALSE CLAIMS ACT would amount to approximately $120 Million per year! In addition, at a minimum of $5,500 per False Claim (for each of the 883,000

False Claims per year) the civil penalties of $5,500 per claim equals approximately $4.8 Billion PER YEAR from 2009 until 2012 (or whenever Yellow Cab became compliant with Rider 55 IF it ever was), and at $11,000 per False Claim the civil penalties are approximately $9.6 Billion per year!!

### G. THE "TWO-CHECK" SYSTEM-- ONE THE DRIVER GOT AND THE OTHER WAS STAMPED "FOR DEPOSIT ONLY" AND DEPOSITED INTO THE ACCOUNT OF --NOT THE DRIVER IT IS MADE PAYABLE TO-- BUT TO THE ACCOUNT OF YELLOW CAB??

86. Yellow Cab also misrepresented the amount it was paying its drivers to not only the State of Texas, but also upon information and belief to the IRS! Defendant Yellow Cab had a "two-check system" where the drivers were supposedly "paid" 2 checks each week-- one for the amount they earned, and another check for stand fees, leasing fees, and the like (with any fines for Medicaid fraud deducted from the checks). The problem was that the driver only received one of the two checks, and the other was stamped "for deposit only" and deposited NOT into the driver's bank account-- but into the bank account of Yellow Cab where the money would then mysteriously disappear!! Moreover, the Defendants would represent to the State of Texas and to the IRS that BOTH checks had been given to and paid to the DRIVER, knowing that the company had kept one of the 2 checks and deposited it into the account of Yellow Cab!! The second check was deducted as a business expense for Yellow Cab, but instead it should have been reported to the IRS as income! The company did this for all 350+/- drivers each week, meaning they were **defrauding the IRS and Medicaid and the drivers themselves to the tune of approximately $175,000 per week, or OVER $ 9 MILLION PER YEAR FOR 12 YEARS!!**

### H. THE MEDICAID AUDITORS ARE COMING, BUT SILLY THEM-- THEY GAVE YELLOW CAB THE CLAIMS THEY WANTED  TO INVESTIGATE IN ADVANCE,  SO  LET'S ALTER THE PAPERWORK, WHITE OUT SIGNATURES,  --DO WHATEVER IT TAKES  TO MAKE THEM GO AWAY-  LET'S EVEN PUT ON A "FAKE DRIVER'S TRAINING COURSE" FOR  THEM FOR GOOD MEASURE!!

87. From time to time Medicaid compliance officers would come to the offices of Yellow Cab and investigate certain claims. The problem with this form of "investigation", however, is that the Medicaid investigators would always make the mistake of telling Liz George in advance

---

what claims they wanted to examine. Each time Yellow Cab would alter documents, white out signatures, print new documents or do whatever it took to cover up the fraud related to the claims being investigated. Relator Mike Jones was instructed by Liz George on multiple occasions to white out, alter and copy over documents to make it seem that the Defendants were not committing Medicaid fraud--sometimes while the investigators were still there! Not only was Yellow Cab committing Medicaid fraud-- it was also fraudulently concealing the fact that it had done so.

88. When Liz George was given a list of claims that Medicaid wanted to investigate, she would then give the list to Relator Mike Jones and Beth Allen to pull up the paperwork to make sure everything was in compliance with Medicaid regulations. Ms. George instructed Beth Allen and Mike Jones to white out a signature if it wasn't supposed to be there, or to sometimes print out a blank page and replace the paperwork altogether! Liz George instructed Relator Mike Jones on multiple occasions to intentionally alter paperwork in order to deceive Medicaid, and in her words "keep covering it up."

## I. WHAT DID NTOF KNOW, WHEN DID IT KNOW IT, AND WHAT DID IT DO ABOUT IT ?

89. According to press releases and articles from the Dallas Business Journal concerning the North Texas Opportunity Fund L.P. ("NTOF"), it was to operate with some strict rules. According to one article when NTOF was formed, "to be eligible for its capital, businesses must be minority- and/or women-owned, or located in or willing to relocate to underserved locations in North Texas, especially South Dallas." In a 2001 article, NTOF was represented to be "a private equity fund focusing on underserved areas in North Texas, particularly South Dallas, invests in minority- and women-owned companies."

90. Upon information and belief NORTH TEXAS OPPORTUNITY FUND, L.P. acquired federal grant money as part of its funding. NTOF postured itself in the press as "a unique, private equity fund that seeks to make equity investments in North Texas companies that are: 1. Located in or willing to expand operations to underserved areas in North Texas, with a special emphasis on the southern sector of Dallas, or 2. Minority or women owned or managed companies located anywhere in North Texas."

91. Investors in the NTOF include: AIG; Bank One; Belo; Randy Burkhart; Communities Foundation of Texas; Dallas Police & Fire Pension System; Daniel A. Hanson; J.P. Morgan Chase & Co.; North Dallas Bank; TXU; Texas Instruments; J. McDonald Williams; Chairman of Trammell Crow; Arthur J. Gallagher & Co.; Frito-Lay; McQueary; Henry, Bowles; Troy L.L.P.; and Northern Trust Bank. Did NTOF tell the U.S. government that gave it a grant for funding NTOF that it used **federal** money to invest in Yellow Cab, a company committing flagrant Medicaid and Medicare fraud **in violation of** state and **federal** law?? Did NTOF advise its investors such as the Dallas Police and Fire Pension System which has hundreds of millions of dollars invested with varying funds of Defendant Lonestar, about investing in Yellow Cab, a company committing massive Medicaid and Medicare fraud??

## THE HARVARD "3" CONNECTION

92. Defendant Hollingsworth earned an undergraduate degree in Economics from Harvard University and has served as Chairman of the Harvard Club of Dallas. He is an inductee in the Harvard Varsity Club Hall of Fame and is a Harvard College Scholar. Hollingsworth currently serves or has served on the boards of Zale Lipshy University Hospital, St. Paul University Hospital, Dallas Convention and Visitors Bureau, Dallas Symphony Orchestra Retirement Plan, and the Dallas Symphony Orchestra Foundation. He is a past Chairman of the North Dallas Chamber of Commerce and also has served as the Vice Chairman of the Dallas Area Rapid Transit Authority, the City of Dallas Reinvestment Zone Board, the City of Dallas Privatization Technical Subcommittee and the LBJ Executive Board which developed the construction plan for IH 635 Freeway. He is also chairman of NTOF's portfolio company, InStaff Personnel, Inc.

93. Defendant Sweetser also holds an undergraduate degree from Harvard University where he was a Harvard College Scholar. He holds the designation of Chartered Financial Analyst from the Association of Investment Management and Research. Mr. Sweetser is or has been a director of several of NTOF's investment companies including InStaff Personnel and Prime Source Food Service Equipment. Sweetser also serves or has served on the board of

several civic and community organizations, including director for the City of Dallas Housing Finance Corporation since 1994 and its Chief Investment Officer since 1996. Sweetser is also a Director of the Dallas-Fort Worth Private Equity Forum and a member of the National Venture Capital Association.

94. Defendant Campbell is also a Harvard graduate, having obtained his MBA from Harvard. Suffice it to say that these 3 Harvard educated managers and owners of NTOF are intelligent enough to know fraud when they see it. Plaintiffs would respectfully submit as set forth below that all monies made by Defendants NTOF, Hollingsworth, Campbell, and Sweetser from their investment in Yellow Cab be immediately returned to the federal government as they can't accept a grant of federal dollars, invest it in a company flagrantly committing Medicaid fraud, and expect to keep the profits derived from an enterprise defrauding the federal government!

### J.  WE BILL FOR TRANSPORTING DEAD PEOPLE!!

95. The most appalling Medicaid and Medicare fraud of all occurred when Yellow Cab submitted claims to Medicaid and Medicare for transportation services for people who had been dead-- sometimes for years!! Relator Robert Spence, a Medicaid transportation driver, was offered a route usually driven by Stanley Moss, a Fort Worth driver, because Moss' wife had passed away and he wanted to take a 6 month leave of absence. Relator Spence reported to Mike Rice, operations manager for Yellow Cab, that he had discovered that most of the people out of the 45 people on this route were dead, including some who had been dead over a year-- and Yellow Cab was still billing Medicaid for fake "trips" reported under the names of deceased Medicaid patients!! When Relator Spence informed Mike Rice he wanted no part of the "list" of dead people because it was Medicaid fraud, Mr. Rice encouraged him to retain that route and to keep billing Medicaid for allegedly "transporting people who were dead"!!

## K. THE NORTH TEXAS OPPORTUNITY FUND HAS
## HAD OTHER COMPANIES THAT IT INVESTED IN AND
## CONTROLLED THAT VIOLATED OTHER FEDERAL LAWS

96. In 2001, about the same time that NTOF invested in Yellow Cab, NTOF invested $5 million in Fresh America, a national produce wholesaler licensed to do business under The Perishable Agricultural Commodities Act ("PACA"). As part of a financial restructuring of Fresh America, NTOF appointed four of the five members of its board of directors. PACA prohibits certain conduct by merchants, dealers, or brokers of perishable agricultural commodities in order to help instill confidence in parties dealing with each other on short notice, across state lines and at long distances and forbids, inter alia, any merchant, dealer, or broker of perishable agricultural commodities from "fail[ing] or refus[ing] truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had." 7 U.S.C. § 499b (4).

97. In 2005, the Agriculture Department filed a complaint against Fresh America, alleging that the company had committed PACA violations between February 2002 and February 2003 by failing to promptly pay a total of more than $1.2 million to 82 sellers of perishable agricultural commodities. In January 2007, an Administrative Law Judge ("ALJ") at the U.S. Department of Agriculture ("Department") found that Fresh America had willfully, repeatedly, and flagrantly violated Section 2(4) of PACA, 7 U.S.C. § 499b(4), by failing to promptly make full payment to produce sellers between February 2002 and February 2003. *In re Fresh Am. Corp.*,66 Agric. Dec. 953, 959 (U.S.D.A.2007). Fresh America did not even contest this decision. During the period when Fresh America committed the PACA violations that gave rise to that case, Defendant Arthur Hollingsworth, the co-founder and partner of the venture-capital and private-equity fund NTOF, was chairman of the board of directors of Fresh America.

98. Similar to this case where Yellow Cab allowed drivers to drive for Medicaid under the MTP Contracts when they had felony and misdemeanor convictions in violation of state and federal law, NTOF had a similar problem with Fresh America with two of its officers. The Perishable Agricultural Commodities Act ("PACA") requires persons who buy or sell specified quantities of perishable agricultural commodities at wholesale in interstate commerce to have a

license issued by the Secretary of Agriculture, see 7 U.S.C. §§ 499a(b)(5)-(7), 499c(a), 499d(a), and makes it unlawful for a licensee to engage in certain types of unfair conduct. The statute requires regulated merchants, dealers, and brokers to "truly and correctly account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had." 7 U.S.C. § 499b(4). It also provides that PACA licensees may not employ, for at least one year, any person found "responsibly connected" to any person whose license has been revoked or suspended, or who has been found to have committed any flagrant or repeated violation of 7 U.S.C. § 499b. See 7 U.S.C. § 499h (b).

99. While the case against Fresh America was pending, the Chief of the PACA Branch of the Fruit and Vegetable Division of the Agricultural Marketing Service determined that two officers of Fresh America, had been "responsibly connected" to Fresh America during the violations period and were therefore subject to the statute's employment restrictions. In March 2009, following a two-day hearing, an ALJ issued a decision affirming the PACA Branch Chief's determinations and concluded that both officers had been responsibly connected to Fresh America during the violations period. In September 2009, a Judicial Officer rejected the petitioners' administrative appeals. *In re Taylor*, PACA App. Docket Nos. 06-0008, 06-0009 (U.S.D.A. Sept. 24, 2009). In holding against the petitioners, the Judicial Officer found that the petitioners were not merely nominal officers of Fresh America. The Judicial Officer also found that Fresh America was not the alter ego of its chairman of the board, Arthur Hollingsworth.

# VI. CAUSES OF ACTION

## COUNT ONE-- SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### [31 U.S.C. §§ 3729(a)(A), (B),(D) and  (G)]]

100. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

101. This is a claim for treble damages, civil penalties and forfeitures under the FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, as amended.

102. Through the acts described above, the Defendants, by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government and/or State of Texas, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. Defendant Yellow Cab authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

103. Through the acts described above and otherwise, defendants knowingly used false records and statements to conceal, avoid, and/or decrease Yellow Cab's obligation to repay money to the United States Government that the defendants improperly and/or fraudulently received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by the Defendants to the United States Government and the State of Texas.

104. The term "claim" as defined in Section 3730 of THE FEDERAL FALSE CLAIMS ACT:

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

105.  A False Claim under Section 3729 of THE FEDERAL FALSE CLAIMS ACT  is defined as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property…or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $ 5,000 [currently approximately $5,500] and not more than $ 10,000 [currently approximately $11,000], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

106. The False Claims submitted by the Defendants in violation of THE FEDERAL FALSE CLAIMS ACT that Relators are aware of include, but are not limited to, the following:

(a) Billing for trips that never actually occurred;

(b) Billing for a caretaker or an attendant when none was provided;

(c)  Billing for an attendant or caretaker when none was necessary;

(d) Engaging in deceptive billing practices to receive excess payment;

(e) Misrepresenting invalid trips and services to receive excess payment;

(f) Forging and/or missing supporting documentation of trips, including transportation trip logs, signed certificates of medical necessity, and signed transportation vouchers;

(g) Billing for excess mileage over and above the trip that was actually taken;

(h) Billing for non-medical services such as taking a beneficiary to run errands, pick up groceries, etc. and billing Medicaid or Medicare for those services;

(i) Providing services through unauthorized personnel such as drivers with criminal records, failed drug tests, unlicensed drivers, etc.;

(j) Billing Medicaid for services for deceased beneficiaries;

(k) Leaving beneficiaries unattended or deserting them;

(l) Not picking up beneficiaries in a timely manner, resulting in missed appointments;

(m) Allowing non-Medicaid drivers to provide transportation for Medicaid patients and billing Medicaid;

(n) Representing to the State of Texas that criminal background checks were performed on all Medicaid drivers when there were in fact NO such background checks for the first 8-9 years of the contract from 2000-2009;

(o) Representing to the State of Texas that it would report Medicaid fraud and turn drivers committing fraud over to the State for prosecution when it had no intention of doing so and never did so;

(p) Misrepresenting the amounts paid to drivers and failing to disclose the "two-check system" whereby Yellow Cab would keep one of the driver's two  checks each week and deposit it into its own bank account;

(q) Failing to disclose its financial interest in the automobiles used for transportation via Dallas Car Leasing, LLC and otherwise, especially after the 2009 MTP Contract Amendment which became effective after Rider 55 was implemented;

(r) Misrepresenting the positions and responsibilities of employees of Yellow Cab as it pertained to their theoretical roles in the Medicaid transportation program; and

(s) Representing to the State of Texas in order to obtain MTP contracts that all of its Yellow Cab Medicaid drivers had to pass a Medicaid training school when there was NO MEDICAID TRAINING SCHOOL!

107.   The United States Government and its citizens have been damaged as a result of Yellow Cab's violations of the FEDERAL FALSE CLAIMS ACT. Accordingly, Relators request that they be awarded 15-25% of the Recovery in the event the U.S. Government and/or the State of Texas intervene in this matter, and 25-30% of the Recovery in the event the State of Texas and/or U.S. Government do not intervene, plus all attorneys' fees, costs and expenses incurred pursuant to the FEDERAL FALSE CLAIMS ACT which provides:

### § 3730. Civil Actions for False Claims

(d) AWARD TO QUI TAM PLAINTIFF

(1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. …Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

## COUNT TWO-- SUBSTANTIVE VIOLATIONS
## OF THE TEXAS FALSE CLAIMS ACT
### [Texas Human Resources Code §§ 36.002 (1), (2), (3) & (12)]

108. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

109.  A "Claim" as defined in Chapter 36.001 of the Texas Medicaid Fraud Prevention Act is as follows:

(1) "Claim" means a written or electronically submitted request or demand that:

(A) is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid , or

(B) states the income earned or expense incurred by a provider in providing a product or a service and that is used to determine a rate of payment under the Medicaid program.

110. Chapter 36.002 of the Texas Medicaid Fraud Prevention Act provides that an unlawful claim (hereinafter "False Claim") is submitted under the following conditions, among others:

A person commits an unlawful act if the person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not  authorized or that is greater than the benefit or payment that is authorized…"

(3) knowingly applies for and receives a benefit or payment on behalf of  another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received....;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift,

money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

> (A) is not licensed to provide the product or render the service, if a license is required; or

> (B) is not licensed in the manner claimed;

(7) knowingly makes a claim under the Medicaid program for:

> (A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;

> (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

> (C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate...;

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent...;

(11) knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;

(12) knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program...".

111. Utilizing the foregoing definitions, as employees of Yellow Cab, Relators observed multiple categories of False Claims submitted by Yellow Cab to and paid by Medicaid. The False Claims Relators observed at Yellow Cab for claims submitted to and paid by Medicaid in violation of the TEXAS FALSE CLAIMS ACT were as follows:

> (a) Billing for trips that never actually occurred;

> (b) Billing for a caretaker or an attendant when none was provided;

(c)  Billing for an attendant or caretaker when none was necessary;

(d) Engaging in deceptive billing practices to receive excess payment;

(e) Misrepresenting invalid trips and services to receive excess payment;

(f) Forging and/or missing supporting documentation of trips, including transportation trip logs, signed certificates of medical necessity, and signed transportation vouchers;

(g) Billing for excess mileage over and above the trip that was actually taken;

(h) Billing for non-medical services such as taking a beneficiary to run errands, pick up groceries, etc. and billing Medicaid or Medicare for those services;

(i) Providing services through unauthorized personnel such as drivers with criminal records, failed drug tests, unlicensed drivers, etc.;

(j) Billing Medicaid for services for deceased beneficiaries;

(k) Leaving beneficiaries unattended or deserting them;

(l) Not picking up beneficiaries in a timely manner, resulting in missed appointments;

(m) Allowing non-Medicaid drivers to provide transportation for Medicaid patients and billing Medicaid;

(n) Representing to the State of Texas that criminal background checks were performed on all Medicaid drivers when there were in fact NO such background checks for the first 8-9 years of the contract from 2000-2009;

(o) Representing to the State of Texas that it would report Medicaid fraud and turn drivers committing fraud over to the State for prosecution when it had no intention of doing so and never did so;

(p) Misrepresenting the amounts paid to drivers and failing to disclose the "two-check system" whereby Yellow Cab would keep one of the driver's two  checks each week and deposit it into its own bank account;

(q) Failing to disclose its financial interest in the automobiles used for transportation via Dallas Car Leasing, LLC and otherwise, especially after the 2009 MTP Contract Amendment which became effective after Rider 55 was implemented;

(r) Misrepresenting the positions and responsibilities of employees of Yellow Cab as it pertained to their theoretical roles in the Medicaid transportation program; and

(s) Representing to the State of Texas in order to obtain MTP contracts that all of its Yellow Cab Medicaid drivers had to pass a Medicaid training school when there was NO MEDICAID TRAINING SCHOOL!

112.  Accordingly, Relators request that all damages and civil penalties allowed under the Texas Medicaid Fraud Prevention Statute be awarded and/or reimbursed to the State of Texas against the Defendants, jointly and severally, as set forth in Section 36.052 thereof as follows:

**36.052. Civil Remedies**

(a) Except as provided by Subsection (c), a person who commits an unlawful act is liable to the state for:

(1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party;

(2) interest on the amount of the payment or the value of the benefit described by Subdivision (1) at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3) a civil penalty of:

(A) not less than $5,000 or more than $15,000 for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by Section 48. 002(a)(8)(A), or a person younger than 18 years of age; or

(B) not less than $5,000 or more than $10,000 for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and

(4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

113.   Relators request that the State of Texas investigate all offices of Yellow Cab for False Claims violations, and that the State of Texas be reimbursed for (a) all such False Claims, (b) civil penalties be assessed in the amount of two times the amount of the claims per Chapter

36.052(a)(4); and (c) civil penalties of $5,000-$10,000 per False Claim be assessed as set forth in Chapter 36.052(a)(3) above.

114.   Relators further request that they be paid a percentage of the overall recovery ranging from 15-25% if the State of Texas intervenes and 25-30% of the recovery in the event the State of Texas does not intervene in accordance with Section 36.110 which provides as follows:

### 36.110. Award to Private Plaintiff

(a) If the state proceeds with an action under this subchapter, the person bringing the action is entitled, except as provided by Subsection (b), to receive at least 15 percent but not more than 25 percent of the proceeds of the action, depending on the extent to which the person substantially contributed to the prosecution of the action; OR

(a-1) If the state does not proceed with an action under this subchapter, the person bringing the action is entitled, except as provided by Subsection (b), to receive at least 25 percent but not more than 30 percent of the proceeds of the action. The entitlement of a person under this subsection is not affected by any subsequent intervention in the action by the state in accordance with Section 36.104(b).

115. Relators request that they be paid from the proceeds of the action in accordance with the above provisions. Additionally, Relators request that they be awarded from the defendants an amount for reasonable expenses, reasonable attorney's fees, and costs that the court finds to have been necessarily incurred in accordance with Section 36.110(c) after the defendants have been found liable in the action.

### COUNT THREE—FEDERAL FALSE CLAIMS ACT CONSPIRACY
### [31 U.S.C. §§ 3729(C)]

116. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

117. This is a claim for treble damages, civil penalties and forfeitures under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

118. Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the United States government by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Defendants. Defendants have taken substantial steps in furtherance of those conspiracies by submitting false claims for payment or approval that contained these improper charges, and by directing their agents and personnel not to disclose and/or to conceal their fraudulent practices and those of their co-Defendants, as well.

119. The Medicare and Medicaid programs, unaware of Defendants' conspiracies or the falsity of the records and statements, have paid claims to the Defendants, and as a result thereof, have paid hundreds of millions of dollars in Medicare and Medicaid reimbursements that they would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by Defendants, the United States has not recovered Medicare and/or Medicaid funds from the Defendants that otherwise would have been recovered.

120. The various Defendants combined, conspired, and agreed together to defraud the United States and the State of Texas by knowingly submitting False Claims and billing the State of Texas for the purpose of getting the False Claims paid, or allowed, and committed other overt acts as set forth above in furtherance of that conspiracy. This conspiracy caused the United States government and the State of Texas to pay hundreds of millions and perhaps billions of dollars for False Claims that should not have been paid to the Defendants, for which damages the Relators seek recovery thereof.

**CONSTRUCTIVE TRUST**

121. Relators request a thorough investigation and accounting of any and all transfers of money by and between the Yellow Cab Defendant entities, including all Defendants named herein and any other companies or entities or persons to which transfers of money received by the Yellow Cab Defendants from Medicare and Medicaid. To the extent that it is determined that the Yellow Cab Defendants have conspired to transfer monies and/or assets and acquire assets

from monies derived directly or indirectly from Medicare and/or Medicaid, Relators request that a constructive trust be established over the property and assets of all such entities, including but not limited to the following companies, persons and entities: IRVING HOLDINGS, INC. d/b/a YELLOW CAB and BUSINESSEXEC SEDAN SERVICE; NORTH TEXAS OPPORTUNITY FUND, L.P.; NTOF CAPITAL PARTNERS, LLC; NORTH TEXAS OPPORTUNITY FUND CAPITAL PARTNERS LP; NTOF CAPITAL PARTNERS, LLC; 3 NORTH TEXAS INVESTMENT ADVISORS LLC D/B/A NTIA - OPPORTUNITY FUND, LLC ; LONE STAR INVESTMENT ADVISORS, LLC; DALLAS CAR LEASING, LLC; YELLOW CHECKER CAB OF DALLAS, INC.; YELLOW CHECKER CAB OF FORT WORTH, INC.; BIG TEX TAXI CORPORATION; TERMINAL TAXI CORPORATION; TERMINAL TAXI CORPORATION OF IRVING; CHOICE  CAB, INC.; CLASSIC SHUTTLE ACQUISITION CORPORATION, INC. D/B/A GO YELLOW CHECKER SHUTTLE; JETTAXI, INC.; us CAB, LLC; DALLAS TAXI, LLC; JEFF FINKEL; JACK BREWLEY; WILLIAM TAUSCHER; ARTHUR HOLLINGSWORTH; GREG CAMPBELL; and LUKE SWEETSER.


## IV. COUNT FOUR--TEXAS MEDICAID FRAUD PREVENTION ACT CONSPIRACY
### [Tex. Human Resources Code § 36.002(9)]

122. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

123. This is a claim for treble damages, forfeitures and civil penalties under the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

124.   Through the acts described above and otherwise, the Defendants entered into a conspiracy or conspiracies with each other and with unnamed co-conspirators to defraud the State of Texas by getting false and fraudulent claims allowed or paid. Defendants have also conspired with each other and with unnamed co-conspirators to omit disclosing or to actively conceal facts which, if known, would have reduced government obligations to the Defendants. Defendants have taken substantial steps in furtherance of those conspiracies by submit false claims for payment or approval that contained these improper costs, and by directing their agents

and personnel not to disclose and/or to conceal their fraudulent practices or those of their co-defendants, as well.

125. The Medicare and Medicaid programs, unaware of defendants' conspiracies or the falsity of the records and statements, have paid claims to the Defendants, and as a result thereof, have paid hundreds of millions of dollars in Medicare and Medicaid reimbursements that they would not otherwise have paid. Furthermore, because of the false records, statements, claims, and omissions caused to be made by Defendants, the State of Texas has not recovered Medicaid funds from the Defendants that otherwise would have been recovered.

126. The Defendants combined, conspired, and agreed together to defraud the United States and the State of Texas by knowingly submitting False Claims and billing the State of Texas for the purpose of getting the False Claims paid, or allowed, and committed other overt acts as set forth above in furtherance of that conspiracy. This conspiracy caused the United States and the State of Texas to pay hundreds of millions and perhaps billions of dollars for False Claims that should not have been paid to the Defendants, for which damages the Relators seek recovery thereof.

## CONSTRUCTIVE TRUST

127. Relators request a thorough investigation and accounting of any and all transfers of money by and between the Yellow Cab Defendant entities, including all Defendants named herein and any other companies or entities or persons to which transfers of money received by the Yellow Cab Defendants from Medicare and Medicaid. To the extent that it is determined that the Yellow Cab Defendants have conspired to transfer monies and/or assets and acquire assets from monies derived directly or indirectly from Medicare and/or Medicaid, Relators request that a constructive trust be established over the property and assets of all such entities, including but not limited to the following companies, persons and entities: IRVING HOLDINGS, INC. d/b/a YELLOW CAB and BUSINESSEXEC SEDAN SERVICE; NORTH TEXAS OPPORTUNITY FUND, L.P.; NTOF CAPITAL PARTNERS, LLC; NORTH TEXAS OPPORTUNITY FUND CAPITAL PARTNERS LP; NTOF CAPITAL PARTNERS, LLC; 3 NORTH TEXAS INVESTMENT ADVISORS LLC D/B/A NTIA - OPPORTUNITY FUND, LLC ; LONE STAR

INVESTMENT ADVISORS, LLC; DALLAS CAR LEASING, LLC; YELLOW CHECKER CAB OF DALLAS, INC.; YELLOW CHECKER CAB OF FORT WORTH, INC.; BIG TEX TAXI CORPORATION; TERMINAL TAXI CORPORATION; TERMINAL TAXI CORPORATION OF IRVING; CHOICE  CAB, INC.; CLASSIC SHUTTLE ACQUISITION CORPORATION, INC. D/B/A GO YELLOW CHECKER SHUTTLE; JETTAXI, INC.; us CAB, LLC; DALLAS TAXI, LLC; JEFF FINKEL; JACK BREWLEY; WILLIAM TAUSCHER; ARTHUR HOLLINGSWORTH; GREG CAMPBELL; and LUKE SWEETSER.

## COUNT FIVE --BREACH OF CONTRACT

128.   Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

129.  Yellow Cab breached its MTP contract(s) with the State of Texas administered by TxDOT and the Texas HHSC by failing to report fraud committed by its drivers as required by contract and by federal and state statutes and regulations. Further, Yellow Cab breached its MTP contract(s) with the State of Texas by failing to conduct criminal background checks on drivers as required by the MTP contract(s) and Texas and federal statutes and regulations. Additionally, Yellow Cab breached its MTP contract(s) by failing to disclose a financial interest in the Medicaid transportation providers/drivers as set forth above. For each of these three reasons, ALL Medicaid claims submitted while the Defendants were in breach of these requirements constitute False Claims subject to the damages and penalties set forth in Counts One - Four above.

## COUNT SIX—NEGLIGENCE

130.   Plaintiffs re-allege and incorporates the foregoing paragraphs as if set forth herein in full.

131.   Yellow Cab breached its duty to the state of Texas pursuant to the MTP Contracts administered by TxDOT and the Texas HHSC by failing to report fraud committed by its drivers as required by its MTP contract(s) and by Texas and federal statutes and regulations. Further, Yellow Cab was negligent by failing to conduct criminal background checks on drivers as required by the MTP Contract(s) and Texas and federal statutes and regulations.  Additionally, Yellow Cab was negligent by failing to disclose a financial interest in the Medicaid

transportation providers/drivers as set forth above. For each of these three reasons, ALL Medicaid claims submitted while the Defendants were in breach of these requirements constitute False Claims subject to the damages and penalties set forth in Counts One - Four above.

## COUNT SEVEN—DEMAND FOR ACCOUNTING AND AUDIT

132. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

133. Plaintiffs on behalf of the United States of America and the State of Texas request and hereby demand an accounting of all claims submitted by Yellow Cab and/or its affiliates or predecessors from the date Yellow Cab was first awarded a MTP Contract until the present, and to have an independent examination as to whether each claim processed was in compliance with Medicaid and Medicare rules and regulations as set forth herein and pursuant to all guidelines under which the Defendants operated. Upon examination of said claims, Plaintiff would further request that the Yellow Cab Defendants be required to reimburse the State of Texas for all claims that were False Claims as defined herein. Plaintiff would further request that Yellow Cab be required to pay for the cost of the audit, and for such other damages as may be applicable for the negligence and/or breach of contract and other causes of action set forth herein.

## COUNT EIGHT--UNJUST ENRICHMENT

134. Plaintiffs re-allege and incorporate the foregoing paragraphs as if set forth herein in full.

135. All of the Defendants were unjustly enriched at the expense of the taxpayers of the United States and the State of Texas. All individual Defendants listed herein should be held personally and jointly and severally liable for the submission of False Claims that was rampant within Yellow Cab.

136. The MTP Contract(s) obtained by the Defendants were obtained based upon false and fraudulent representations, and the Defendants should forfeit all monies received from Medicaid and/or Medicare pursuant to said contracts.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Relators, on behalf of themselves and the United States Government and State of Texas, pray that this Complaint be received and filed in camera under seal until further Order of the Court, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

### RELIEF AS TO THE U.S. GOVERNMENT

(a) That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the FEDERAL FALSE CLAIMS ACT; and

(b) that this Court enter a judgment against the Defendant for a civil penalty of $11,000 for each of Defendants' violations of the Section 3729 of the FEDERAL FALSE CLAIMS ACT; and

(c) that Relators  recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action; and

(d) that Relators be awarded all reasonable attorneys' fees and expenses in bringing this action; and

(e) that in the event the United States government proceeds with this action, Relators be awarded the maximum amount for bringing this action of  25% of the proceeds of the action pursuant to Section 3730(d) of the FEDERAL FALSE CLAIMS ACT; and

(f) that in the event the United States government does not proceed with this action, Relators be awarded the maximum amount for bringing this action of 30% of the proceeds of the action pursuant to Section 3730(d) of the FEDERAL FALSE CLAIMS ACT; and

(g) that Relators be awarded pre-judgment and post-judgment  interest; and

(h) that defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*; and

(i) that a trial by jury be held on all issues so triable; and

(j) that Relators and the United States receive all relief to which either or both may be entitled at law or in equity as the Court deems just and proper.

.

## RELIEF ON BEHALF OF THE STATE OF TEXAS

(a) That the State of Texas be reimbursed for all False Claims submitted by and approved by the Defendants; and

(b) that civil penalties be assessed in the amount of two times the amount of each False Claim per Chapter 36.052(a)(4) of the Texas Medicaid Fraud Prevention Act; and

(c)  that civil penalties of $10,000 per False Claim be assessed as set forth in Chapter 36.052 (a) (3) of the Texas Medicaid Fraud Prevention Act; and

(d) that pre- and - post judgment interest be awarded from the date of submission of each False Claim until the date of Judgment; and

(e) that the Court order an accounting and audit of all claims submitted by the Defendants from the date each Yellow Cab office opened until present at the expense of the Defendants; and

(f) that a constructive trust be placed on all assets of all Defendants herein that are derived from Medicaid funds paid for False Claims; and

(g) that the Court award reasonable attorneys' fees, costs, and expenses which the Relators reasonably incurred in bringing and pursuing this case; and

(h) that the Court award to Relators the maximum amount allowed to them as Relators pursuant to Chapter 36.110 of the Texas Medicaid Fraud Prevention Act and any other laws of the State of Texas permitting same, including but not limited to 25% of the amount of the recovery against the Defendants if the State of Texas intervenes, and 30% of the recovery in the event the State of Texas does not intervene, and

(i)  That defendants cease and desist from violating Texas Human Resources Code §§ 36.001 *et seq;* and

(i)  That the Court award such other and further relief as it deems proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.


DATED, this the _3rd_ day of August, 2012.

RESPECTFULLY SUBMITTED

**LAW OFFICES OF JAMES R. TUCKER, P.C.**

*Jim Rusty Tucker*

**JAMES "RUSTY" TUCKER**
**LAW OFFICES OF JAMES R. TUCKER, P.C.**
**STATE BAR NO. 20272020**
**5949 SHERRY LANE**
**SUITE 1700**
**DALLAS, TX 75225**
**214-740-3000 (PHONE)**
**214-740-3001 (FACSIMILE)**
**rusty@rustytuckerlaw.com**